UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| VICOR CORPORATION, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> VIGILANT INSURANCE COMPANY, ) <br> FEDERAL INSURANCE COMPANY and ) <br> CONTINENTAL CASUALTY ) <br> COMPANY, ) <br> ) <br> Defendants. ) <br> ) | Civil Action No.: 07-CA-10517 WGY |

### DEFENDANTS VIGILANT INSURANCE COMPANY, FEDERAL INSURANCE COMPANY AND CONTINENTAL CASUALTY COMPANY'S JOINT MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL

### I.   INTRODUCTION

Pursuant to Fed. R. Civ. P. 37 and L.R. 37.1, Defendants Vigilant Insurance Company ("Vigilant"), Federal Insurance Company ("Federal") and Continental Casualty Company ("Continental") seek an Order compelling Plaintiff Vicor Corporation ("Vicor") to produce documents improperly withheld.[1]

In this insurance coverage dispute, the insured, Vicor, has improperly withheld a voluminous amount of documents from its underlying defense counsel's files on the basis of the attorney-client and work product privileges. Moreover, despite withholding these documents, Vicor has produced other similar documents that arguably would be subject to these same privileges. Vicor cannot pick and choose the "privileged" documents that it provides to its

---

[1] Where appropriate, Federal and Vigilant hereinafter are collectively referred to as "Chubb."

1

insurers, while simultaneously withholding others. Thus, despite Vicor's contentions to the contrary, its insurers are entitled to the documents withheld by Vicor for several reasons.

First, the attorney-client and work product privileges do not apply as between Vicor and its insurers in the context of the tripartite insurer/insured/defense counsel relationship and the common interest that existed among them in connection with the underlying matter. Second, assuming, *arguendo*, that Vicor denies the insurers' entitlement to the withheld documents on the basis of the common interest doctrine, the insurers are entitled to the withheld documents because Vicor cannot seek reimbursement of defense and indemnity costs from its insurers while simultaneously seeking to prevent its insurers from reviewing the very documents that form the best evidence relating to matters that Vicor has placed "at issue" in this insurance coverage dispute. Third, assuming, *arguendo*, that Vicor denies the insurers' entitlement to the withheld documents on the basis of the common interest doctrine or at issue doctrine, then Vicor has waived any potentially applicable privileges by previously sharing exclusive privileged communications with its insurers.

Accordingly, Chubb and Continental respectfully request that this Court grant their Joint Motion to Compel.

## II.   STATEMENT OF FACTS

### A.   The Chubb and Continental Insurance Policies

Vigilant issued a primary general liability policy to Vicor with a policy period of October 1, 2003 to October 1, 2004 (the "Vigilant Policy"). The Vigilant Policy contains limits of $1 million per occurrence and $2 million in the aggregate. The Vigilant Policy also includes separate errors and omissions coverage for information and network technology liability. This errors and omissions coverage contains a $10 million limit, with defense costs within limits and a

$100,000 deductible per claim and a 10% coinsurance provision. Federal issued a first-layer excess umbrella policy to Vicor for a policy period of October 1, 2003 to October 1, 2004 (the "Federal Policy").[2] The Federal Policy contains limits of $12 million per occurrence and in the aggregate.[3]

Continental issued a second-layer Excess Third Party Liability Policy to Vicor with a policy period of October 1, 2003 to October 1, 2004 and a limit of liability of $8 million per occurrence and in the aggregate (the "Continental Policy"). The Continental Policy provides that it is excess of the Federal Policy.

**B.      The Underlying Litigation**

     **1.      Ericsson's Claims Against Vicor.**

During the relevant time period, Ericsson was engaged in the design, manufacture and sale of electronic equipment used in wireless communication systems known as radio base stations. Ericsson's customers for these radio base stations included wireless communication service providers that used Ericsson's radio base stations as part of their wireless network infrastructure. Beginning in 2000, Vicor sold power converters to Ericsson for use in Ericsson's radio base stations. Vicor's power converters were intended to regulate the supply of electricity to various components of Ericsson's radio base stations.

In May 2004, Ericsson filed the Underlying Litigation in California state court against Vicor, alleging that Ericsson's radio base stations began to experience "unacceptably high" failure rates with Vicor's power converters beginning in late 2000. Ericsson's Third Amended Complaint against Vicor in the Underlying Litigation alleged that Vicor knew that its power

---

[2] Where appropriate, the Federal Policy and the Vigilant Policy hereinafter are collectively referred to as the "Chubb Policies."
[3] In addition to the Chubb Policies, Chubb also issued similar polices of insurance to Vicor from October 1, 2000 to October 1, 2003.

3

converters were defective as early as late 2001 and early 2002 when Vicor and its parts supplier, Exar, redesigned the "brain" used in Vicor's power converters. Ericsson alleged that Vicor was liable to Ericsson for damages suffered by Ericsson as a result of failures of Vicor power converter units that were used in radio base stations manufactured by Ericsson. In the Underlying Litigation, Ericsson brought claims against Vicor for Breach of Contract, Breach of Express Warranty, Breach of Implied Warranty, Negligent Design and Manufacturing, Fraud by Concealment, Fraud by Misrepresentation, Negligent Misrepresentation, and Unfair Competition. Ericsson also alleged lost profits in the range of $1.4 billion to $2.9 billion, as well as exemplary and punitive damages for fraud relating to Vicor's pre-existing knowledge of the defective nature of its power converters.

### 2. Chubb's Defense of Vicor in the Underlying Litigation.

At the outset of the Underlying Litigation, Chubb agreed to provide defense and indemnity coverage under the Vigilant Policy's errors and omissions coverage for information and network technology liability. Because Chubb issued a reservation of rights to Vicor on the basis of several coverage issues, Chubb permitted Vicor to select its own defense counsel, and, notably, paid for Vicor's defense. Vicor selected the law firm of Mirick O'Connell, a firm based in Worcester, Massachusetts, to defend it in the Underlying Litigation in California. Vicor also selected the San Francisco office of Paul Hastings to act as Vicor's "local" counsel in the Underlying Litigation based in San Diego, California.

At the inception of the Underlying Litigation in May 2004, it was Chubb's initial position that Ericsson's lawsuit against Vicor did not implicate general liability coverage because there were no allegations of third-party property damage. However, Chubb ultimately did agree to provide general liability coverage following Ericsson's filing of its First Amended Complaint

against Vicor in November 2004, which included, for the first time, allegations of potentially covered property damage. During the course of the Underlying Litigation, Chubb paid approximately $5 million to Vicor's independently selected defense counsel.

Throughout the entire Underlying Litigation, Mirick O'Connell regularly communicated information to Chubb during the course of the Underlying Litigation that constituted attorney-client communications and attorney work product. These protected communications were necessary to further Vicor and Chubb's common interest in defending against the Ericsson litigation. Mirick O'Connell's communications with Chubb, which often openly discussed Mirick O'Connell's forward-thinking defense strategy and objective analysis of Ericsson's claims, unquestionably were privileged as to third-parties such as Ericsson. (See Affidavit of Nicole L. Cook in Support of Defendants Vigilant Insurance Company, Federal Insurance Company and Continental Casualty Company's Joint Motion to Compel, ¶¶ 7-8.)

### 3.     **The Underlying Settlement.**

Formal mediation of the Underlying Litigation began in February 2007. In March 2007, Vicor and Ericsson finalized a settlement of the Underlying Litigation for $50 million. Despite Vicor's obligation to establish the existence of potentially covered third-party property damage as a prerequisite to receiving indemnity coverage under the Chubb and Continental policies, Vicor never attempted to quantify covered property damage during the course of the Underlying Litigation. Similarly, Vicor also failed to allocate the $50 million underlying settlement amount between the potentially covered and unquestionably non-covered causes of action asserted against it.

Thus, in its own effort to quantify potentially covered third-party property damage, Chubb retained a forensic accountant to determine the amount of property damage implicated by

Ericsson's lawsuit against Vicor. As a result of that effort, Chubb determined that Vicor's product failures caused approximately $3.017 million of potentially covered third-party property damage. Thus, Chubb paid a total of approximately $12.8 million in indemnity dollars to Vicor to partially fund the $50 million underlying settlement. Chubb's indemnity payment consisted of the remaining $9.8 million limit from the information and network technology liability coverage, $1 million from the Vigilant Policy's primary general liability coverage, and approximately $2.017 from the Federal Policy's excess umbrella coverage. These payments were in addition to the $5 million that Chubb paid Vicor's independently selected counsel to defend Vicor in the Underlying Litigation.

Because Vicor could not establish covered property damage in an amount that exceeded the Federal Policy's limits, Continental declined to indemnify Vicor for any part of the underlying settlement. Moreover, Continental further declined to indemnify Vicor for the settlement because, among other things, Vicor failed to allocate any of the settlement proceeds between the myriad of Ericsson's claims (including the significant fraud claims), and Vicor failed to allocate covered property damage to the Continental Policy period of October 1, 2003 to October 1, 2004.

### C. **This Declaratory Judgment Action**

In this declaratory judgment action, Vicor seeks reimbursement of the remaining $37,000,000 that it paid or will pay to fund its $50,000,000 settlement with Ericsson. In addition, Vicor also seeks an additional $2,500,000 from Chubb for defense costs that Chubb, for various reasons, declined to pay to Vicor's defense counsel in the Underlying Litigation.

During the deposition of one of Vicor's Rule 30(b)(6) designees in this Declaratory Judgment action, Vicor's Vice President of Human Resources, Richard Zengilowski, testified

that Vicor obtained a release of all claims asserted by Ericsson against Vicor as a result of the $50 million underlying settlement.[4] Paradoxically, however, Mr. Zengilowski also testified that of the entire $50 million that Vicor paid to settle the Ericsson lawsuit, none of it was paid on account of non-covered claims. In particular, Mr. Zengilowski was shown page 27 of Mirick O'Connell's February 7, 2007 status report referenced above, which summarizes Ericsson's claim for damages and breaks it down into ten categories. Mr. Zengilowski testified that of the ten categories plus an additional category that was not included in the Mirick O'Connell report, only seven of the eleven categories potentially would be covered under the policies at issue.

Moreover, Mr. Zengilowski recognized that two of those seven potentially covered categories contained elements that were not covered. For example, Mr. Zengilowski acknowledged that Ericsson's $33 million claim for its "retrofit program" contained both non-covered and potentially covered components. Specifically, Mr. Zengilowski testified that costs to proactively replace Vicor's power converters that had not yet failed in the field were not covered, but costs to repair or replace failed power converters potentially would be covered. The admittedly non-covered portion of Ericsson's retrofit program constituted a significant portion of that effort. Nevertheless, despite Mr. Zengilowski's recognition that no coverage was afforded for four of the eleven categories of Ericsson's alleged damages, and that only portions of two of the other seven categories potentially were covered, Mr. Zengilowski and Vicor incredulously maintain that <u>none</u> of the $50 million underlying settlement was paid for non-covered claims.

---

[4] Chubb and Continental acknowledge the potentially privileged nature of Mr. Zengilowski's deposition testimony. Chubb and Continental also recognize that under the Protective Order governing confidential material in this matter, the parties' time for designating Mr. Zengilowski's deposition testimony as "confidential" has not yet run. Thus, in an abundance of caution, Chubb and Continental have avoided disclosing any potentially privileged content of Mr. Zengilowski's testimony. Of course, should the Court desire to review any portion of the transcript or associated exhibits, copies will be made available to the Court upon request for an *in camera* inspection.

Despite making the assertions noted above, and despite the history of privileged attorney-client and work product exchanges between Vicor and its insurers from the inception of the Underlying Litigation until its settlement, Vicor now seeks to withhold all communications between Vicor and its underlying defense counsel in connection with the Underlying Litigation, including any communications relating to the mediation and settlement of the Ericsson lawsuit. Although Chubb and Continental have endeavored to obtain this information from other sources, the fact remains that no better evidence exists regarding Vicor's motivations for entering into the underlying settlement than the contemporaneous, documented communications between Vicor and its underlying defense counsel.

### III. LEGAL ARGUMENT

#### A. VICOR MAY NOT WITHHOLD DOCUMENTS FROM THE UNDERLYING LITIGATION ON THE BASIS OF THE ATTORNEY-CLIENT PRIVILEGE AND/OR THE WORK PRODUCT DOCTRINE

As indicated by its voluminous privilege logs, Vicor seeks to withhold a multitude of documents from its Underlying Litigation with Ericsson on the basis of the attorney client privilege and/or the work product doctrine.[5] See Ex. B and D. The Supreme Judicial Court of Massachusetts recently has reiterated that "[a] party asserting the attorney-client privilege (or protected work product) has the burden to show that the privilege applies." Hanover Ins. Co v. Rap & Jensen Ins. Servs., Inc., 449 Mass. 609 (2007) (citing In the Matter of the Reorganization of Elec. Mut. Liab. Ins. Co. Ltd. (Bermuda), 425 Mass. 419, 421, 681 N.E.2d 838 (1997)). As set forth below, Vicor cannot meet its burden in this regard because (1) as a result of their common interests in connection with the defense of the Underlying Litigation, Vicor's insurers are entitled to privileged communications between Vicor and its underlying defense counsel; (2)

---

[5] Continental notes that there are some documents identified on Vicor's privilege logs involving communications with Vicor's coverage counsel. As these documents pertain to coverage issues in the instant declaratory judgment action, Continental does not seek their production.

8

assuming, *arguendo*, that Vicor's insurers are not entitled to the withheld documents pursuant to the common interest doctrine, the insurers are entitled to the materials pursuant to the "at issue" doctrine; and (3) assuming, *arguendo*, that Vicor denies the insurers' entitlement to the withheld documents on the basis of the common interest doctrine or the at issue doctrine, then Vicor has waived any potentially applicable privileges by previously sharing exclusive privileged communications with its insurers.

### 1. Vicor's Insurers Are Entitled to Privileged Communications Between Vicor and Its Underlying Defense Counsel Under the Common Interest Doctrine.

Although it does not appear that any published decisions from Massachusetts have addressed this particular issue, various courts throughout the country have found the attorney-client privilege and work product doctrine inapplicable to preclude disclosure of the insured's underlying defense files in a subsequent coverage action. In a widely-cited case on the issue, Waste Management, Inc. v. International Surplus Lines Ins. Co, 579 N.E.2d 322 (Ill. 1991), the insured sought coverage from its insurers with respect to two underlying environmental litigations. Id. at 186-87. The insurers denied coverage, leading both the insured and the insurers to file declaratory judgment actions. Id. at 186. During discovery, the insurers requested the production of the insured's defense counsel's files in the underlying litigations and the insured withheld certain documents based upon the attorney-client and work product privileges. Id. at 187.

In concluding that the insured could not properly withhold the underlying defense files, the Supreme Court of Illinois relied upon two lines of reasoning: (1) that the insured's duty to cooperate rendered the attorney-client and work product privileges inapplicable; and (2) that, notwithstanding the duty to cooperate, such privileges were unavailable to the insured because of

the common interest between the insurers and insureds in the underlying action. See id. at 327-31. With respect to the former, the court explained that the "cooperation clause imposes a broad duty of cooperation and is without limitation or qualification" and that "it cannot be seriously contended that insureds would not be required to disclose contents of any communications they had with defense counsel representing them on a claim for which insurers has the ultimate duty to satisfy." Id. at 328. The court further rejected the insureds' argument that the purpose of the cooperation clause was mooted once the underlying lawsuit was terminated, stating that the duty continued for as long as the insureds sought to enforce the policy terms regardless of whether the parties were now adverse. Id. at 328.

With respect to its second line of reasoning, the court concluded that the insurers and insureds had a common interest in either defeating or settling the underlying suits and that the insurer's refusal to provide a defense in those suits did not nullify their common interests. Id. at 328-29. The court noted that to "deny discovery in this instance would be to disregard considerations of public policy which require encouragement of full disclosure by an insured to his insurer." Id. at 329. Likewise, the court rejected the insureds' reliance on the work product doctrine:

> Here . . . insureds seek to have insurers pay for their defense
> counsel's services while at the same time claiming that the insurers
> have no right to examine counsel's files. We think that even the
> seemingly impenetrable work-product doctrine would not permit
> such unfairness and potential injustice.

Id. at 331. Accordingly, the court ruled that "underlying defense litigation documents . . . cannot be privileged from insurers who may bear the ultimate burden of payment." Id. at 336.

Numerous courts have relied on the reasoning of the Waste Management decision in rejecting insureds' attempts to withhold documents from the underlying defense files on the basis

10

of attorney-client privilege and/or the work product doctrine. See, e.g., Metro Wastewater Reclamation District v. U.S. Fire Ins. Co., 142 F.R.D. 471, 476, 478 (D. Colo. 1992) (finding the attorney-client privilege and work product doctrine inapplicable to prevent discovery of underlying defense documents in a subsequent coverage dispute between insured and insurer); EDO Corp. v. Newark Ins. Co., 145 F.R.D. 18, 23 (D. Conn. 1992) ("communications between an insured and its attorney connected with the defense of underlying litigation are normally not privileged vis-à-vis the insured's carriers in subsequent litigation."); Indep. Petrochem. Corp. v. Aetna Cas. & Sur. Co., 654 F. Supp. 1334, 1365 (D.D.C. 1986) (concluding that access to documents in connection with underlying litigation was essential and could not be privileged from carriers who were obligated to shoulder the burden of defending against such claims).

In an unpublished trial court decision, the court in Dedham-Westwood Water Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 2000 WL 33593142, *4 (Mass. Super. Ct. Feb. 2, 2000), rightly observed as follows:

> When an attorney acts for two different parties who each have a common interest, communications by either party to the attorney are not necessarily privileged in a subsequent controversy between the parties. Under this doctrine "when an attorney has been retained to represent both the insured and insurer in a third party action, communications by either party will not be privileged . . . even if their interests later diverge."

Id. (quoting Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 623 A.2d 1118, 1123-24 (Del Super. 1992)). In Dedham-Westwood, the claimant, Dedham-Westwood, filed a claim against the insured, Shield, in the underlying environmental litigation. Shield tendered the matter to its insurers, who denied any obligation to defend or indemnify Shield. Shield and Dedham-Westwood ultimately settled their dispute, and the settlement agreement included an assignment to Dedham-Westwood of Shield's rights in certain insurance policies. Dedham-Westwood subsequently brought a coverage action against Shield's insurer, Commercial Union.

Dedham-Westwood claimed that Commercial Union was obligated to indemnify Shield against Dedham-Westwood's claims and, thus, was obligated to pay Dedham-Westwood the amounts for which Commercial Union was obligated to indemnify Shield. Commercial Union filed a motion to compel, seeking certain documents from Shield relating to the underlying lawsuit that Shield alleged were privileged. Commercial Union argued, in part, that the common interest doctrine defeated Shields claims of privilege.

Although the court in Dedham-Westwood held that the common interest doctrine was inapplicable to the facts of that case, it did so on the limited basis that Commercial Union refused to participate in Shield's defense of the underlying case. Indeed, the court reasoned as follows:

> Therefore, since Commercial Union never participated in any fashion in the defense of the Underlying Cases, it thus never retained or consulted an attorney in common with Shield.
>
> ***
>
> "To permit insurers unrestrained access to attorney-client communications and work product where those insurers refused to take part in litigation despite notice and an opportunity to participate would distort the 'common interest' doctrine."

Id. at *4-5 (quoting Pittston Co. v. Allianz Ins. Co., 143 F.R.D. 66, 71 (D.N.J. 1992)). Cf. Am. Auto. Ins. Co. v. J.P. Noonan Transp., Inc., 2000 WL 33171004, *7 (Mass. Super. Nov. 16, 2000) (concluding that insurer entitled to disclosure of communications between its insured and its insured's underlying defense counsel upon eventually assuming its insured's defense, even if the communications were otherwise privileged as to others).

Unlike Dedham-Westwood, it is undisputed that Chubb funded Vicor's defense in the Underlying Litigation. Moreover, the common interest between Vicor and its insurers is evidenced by numerous "privileged and confidential" communications and reports provided to Vicor's insurers by Mirick O'Connell throughout the course of the Underlying Litigation. (See

Affidavit of Nicole L. Cook in Support of Defendants Vigilant Insurance Company, Federal Insurance Company and Continental Casualty Company's Joint Motion to Compel, ¶¶ 7-8.)

Despite its requests for reimbursement of the underlying settlement, Vicor refuses to provide its insurers with access to documents it claims are protected by the attorney-client privilege and/or work product doctrine. It is undisputed that Chubb agreed to fund Vicor's defense in the Underlying Litigation under a reservation of rights, and that Chubb and Vicor had a common interest in defeating and/or limiting Ericsson's claims. Regardless of the current adversarial nature between the parties, Vicor cannot now be permitted to use the attorney-client privilege and work product doctrines as shields to prohibit its insurers from obtaining documents indistinguishable from other common interest communications between Vicor and its insurers in the Underlying Litigation. Accordingly, Chubb and Continental are entitled to the entirety of Vicor's underlying defense file, including communications with and between its underlying defense counsel and underlying expert witnesses and consultants.[6]

2. **Assuming, *Arguendo*, That the Insurers Are Not Entitled to the Withheld Documents Pursuant to the Common Interest Doctrine, the Insurers Are Entitled to the Materials Pursuant to the "At Issue" Doctrine.**

Chubb and Continental also move to compel production of the withheld documents pursuant to the "at issue" doctrine. The "at issue" doctrine is an exception to the attorney-client privilege and the work product doctrine that requires the production of otherwise protected material. See, e.g., Darius v. City of Boston, 433 Mass. 274 (2001) ("[w]e accept the premise underlying the concept of 'at issue' waiver of the attorney-client privilege: there are circumstances in which a litigant may implicitly waive the privilege, at least in part, by injecting certain types of claims or defenses into a case."); Bobick v. U.S. Fid. & Guar. Co., 439 Mass.

---

[6] Notably, Chubb and Continental do not seek any attorney-client communications between Vicor and its coverage counsel relating to insurance coverage advice and counseling.

652 (2003) (citing <u>Darius</u> for the proposition that a "litigant may implicitly waive attorney-client privilege by injecting certain claims or defenses into case"); <u>F.D.I.C. v. R.W. Beck, Inc.</u>, 2004 WL 1474579, *2 (D. Mass July 1, 2004) (concluding that "the analysis of an 'at issue' waiver is essentially the same with respect to both [the attorney-client and work product] privileges").

Courts have applied the at issue doctrine to prevent insureds from using the attorney-client privilege as a shield to prevent discovery, when the insureds themselves have placed conduct regarding issues that involve the insured, or the insured's counsel, at issue through its claims against an insurer. <u>See, e.g., Dedham-Westwood</u>, 2000 WL 33593142 at *3 (citing <u>Hoechst Celanese Corp.</u>, 623 A.2d at 1125 for the proposition that "[c]ourts applying the 'at issue' doctrine in the context of insurance coverage may not invoke the attorney-client privilege as a shield for discovery as to issues regarding the conduct of the insured or the insured's counsel where the conduct has been placed in issue via the insured's claims); <u>R.W. Beck</u>, 2004 WL 1474579 at *1 (stating that "[i]t is settled law that by placing privileged communications or attorney work product "at issue" in civil litigation, a party waives any applicable claim of privilege"). The at issue doctrine applies when (1) by some affirmative act, (2) the party makes the protected information relevant to the case, and (3) the opposing party is thereby denied access to information vital to its defense. <u>Dedham-Westwood Water District</u>, 2000 WL 33593142 at *4. The information is "vital" only if it is not available from any source. <u>Id.</u>; <u>Darius v. City of Boston</u>, 433 Mass. 274 (2001); <u>Angelo Tedesco Corp. v. Massachusetts Highway Dept.</u>, 2007 WL 1630692, at *1 (April 25, 2007); <u>R.W. Beck</u>, 2004 WL 1474579 at *2, n. 4 (recognizing that when advice is provided by counsel to a party, "given the confidentiality of [such communications], there is no legitimate alternative through which [a party] can obtain access to this advice, other than by invoking the court's power to compel disclosure").

Here, Vicor has placed its motives for the settlement at issue in this case in that Vicor asserts that the underlying settlement wholly was for covered claims alleged by Ericsson in the Underlying Litigation. Vicor has asserted through deposition testimony and written discovery responses that all of the $50 million paid to settle the Underlying Litigation was for covered claims. Additionally, Vicor has selectively produced privileged documents to its insurers, while simultaneously withholding others. The insurers are not required to blindly accept the self-serving statements made by Vicor and its coverage counsel now made in the context of insurance coverage litigation. Much better evidence exists in the form of documents and communications that were created contemporaneously with the Underlying Litigation. Moreover, Vicor should not be permitted to pick and choose the privileged documents that it produces to its insurers in support of its claims for insurance coverage, while refusing to produce others that may refute its claims.

Vicor's insurers are entitled to review and evaluate that evidence in an effort to either confirm or refute the self-serving assertions now made by Vicor. Moreover, this best evidence cannot be obtained by Chubb and Continental through any less intrusive means. Indeed, a review of these contemporaneously created documents is the only means by which Vicor's insurers can fairly evaluate Vicor's present assertion that the underlying settlement was made entirely for covered claims.

3. **Assuming, *Arguendo*, That the Insurers Are Not Entitled to the Withheld Documents Pursuant to the Common Interest Doctrine or the At Issue Doctrine, Vicor Has Waived Such Privileges.**

It is well-established in jurisdictions across the country that "[a] party's voluntary disclosure of documents which are otherwise protected by the attorney-client privilege waives the privilege as to any other communications pertaining to the same subject matter." Grieco v.

Fresenius Medical Care Holdings, Inc, 2008 WL 516539, at * 4 (Mass. Super. Feb. 20, 2008). Simply put, if a client chooses to reveal confidential advice provided by counsel to a third-party, the privilege is waived. Transocean Capital, Inc. v. Fortin, 2006 WL 3246401 (Mass. Super. Oct 20, 2006). AMCA Int'l Corp. v. Phipard, 107 F.R.D. 39 (D. Mass. 1985); see Matter of Reorganization of Elec. Mut. Liability Ins. Co., Ltd., 425 Mass. 419 (1997) (a client can waive the attorney-client privilege by intentionally revealing confidential information to third-parties). In addition, "disclosing material in a way inconsistent with keeping it from an adversary waives work product protection." U.S. v. Massachusetts Inst. of Tech., 129 F.3d 681, 687 (1st Cir. 1997).

As noted above, the reports and updates provided by Mirick O'Connell to Chubb clearly constituted attorney-client communications and were prepared in the context of the Underlying Litigation. In addition, they previously were produced by Vicor to its insurers, despite their protected nature. Vicor's production of these privileged documents acts as a general waiver and vitiates the attorney-client privilege and work product doctrine with respect to any information, privileged or otherwise, pertaining to the Underlying Litigation. As such, Chubb and Continental's Joint Motion to Compel production of these documents should be granted.

## IV.   CONCLUSION

For all of the reasons stated in this Memorandum of Law and in the accompanying Motion and Affidavits of Nicole L. Cook and Matthew J. Lodge, Chubb and Continental respectfully request that this Court enter an Order granting Chubb and Continental's Joint Motion to Compel.

Respectfully submitted,

**VIGILANT INSURANCE COMPANY
AND FEDERAL INSURANCE COMPANY**
By its attorneys

/s/ Nicole L. Cook
Robert P. Powers
BBO #544691
Nicole L. Cook
BBO #652593
Melick, Porter & Shea, LLP
28 State Street
Boston, MA  02109
(617) 523-6200

**CONTINENTAL CASUALTY COMPANY**
By its attorneys

/s/ Richard E. Heifetz
Richard E. Heifetz
BBO #229000
Tucker, Heifetz & Saltzman, LLP
100 Franklin Street
Boston, MA  02110
(617) 557-9696

Of Counsel for Defendant

/s/ Matthew J. Lodge
Christopher R. Carroll
Matthew J. Lodge
David R. Anderson
Carroll, McNulty & Kull L.L.C.
120 Mountain View Boulevard
Basking Ridge, NJ  07920
(908) 848-6300

Dated: August 1, 2008

## CERTIFICATION PURSUANT TO LOCAL RULES 7.1(A)(2) AND 37.1(B)

I hereby certify that the parties have conferred and have attempted in good faith to resolve or narrow the issues presented by this motion. Despite such efforts, the parties were unable to resolve the instant discovery dispute, necessitating the filing of this motion.

/s/ Nicole L. Cook

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 1, 2008.

/s/ Nicole L. Cook